Good morning, Your Honors. May it please the Court, my name is Celeste Bakke and I represent Petitioner Jofama Coleman. I'd like to reserve two minutes of my time for rebuttal. Okay. I'll be focusing my argument today on Mr. Coleman's jury misconduct claim. Mr. Coleman was convicted of homicide by gun and sentenced to 25 years to life in prison by a jury that was presented with extrinsic, highly prejudicial evidence not produced at trial, which showed that Mr. Coleman had been arrested on a charge of felon in possession of a concealed loaded firearm approximately one month before the homicide. Three months after the trial, one juror, Juror No. 5, was so disturbed by the jury's receipt of this information and could not get it out of her head that she took the extraordinary step of writing the trial judge to tell him, quote, I know for a fact that the details of this prior arrest influenced the jury's decision in determining the verdict. Juror No. 5 later testified that the jury reviewed this evidence even after another juror commented that they shouldn't look at it and that the jury's knowledge of Mr. Coleman's criminal history was, quote, the white elephant in the room that you don't talk about. Before we get to the merits of the claim, could you talk about whether AEDPA applies? We argue in our briefs that AEDPA does not apply because the state court did not address the federal constitutional claim of jury misconduct. So the presumption of Johnson v. Williams does not, or is rebutted in this case. Now sometimes the Supreme Court tells us that we're just supposed to assume that the state court, knowing its job, addressed both. So how do we get around that assumption? There are several factors in this case that demonstrate that the presumption is rebutted. First, the state test does not subsume the federal test. So the harmless error test for a state juror misconduct claim is different than the harmless error test for the federal juror misconduct claim. And Johnson v. Williams explains that that's a key factor in determining whether the state court did, in fact, properly address a federal claim. Other elements include the fact that the federal district court, in its order, did not analyze this claim under AEDPA. It referenced the fact that the state court of appeals denied the claim, but it never applied AEDPA to demonstrate... Well, I'm not interested in what the magistrate judge did. I'm interested in what the state court did so I can figure out whether the state court addressed the federal claim, or rather decided the federal claim. Because sometimes they can decide the federal claim without, or we're required to assume they decided the federal claim, even though the state court does not explicitly address it. Correct, Your Honor. And again, I would go back to the key factor being that the state harmless error test and the federal harmless error test are different, and the state court did not apply the federal harmless error test for this kind of claim, which is Chapman. But, counsel, there's some language in the Johnson case that says whether, the question is whether or not the California Supreme Court understood itself to be deciding a question with federal constitutional dimensions. Now, that doesn't, what exactly that means, I'm not entirely sure. But I think what it does mean, it doesn't have to be exactly lockstep, federal and state. And the fact that the state court here cited Carpenter, which cites a lot of Supreme Court cases, federal Supreme Court cases, in light of there being a presumption to begin with, plus we have Carpenter citing those cases, how do we overcome all of that to get to where you want to be? I think there are two answers to that question, Your Honor. First is that, while Carpenter does discuss a federal constitutional claim, all of the state court of appeals cites to state cases talked about the state test, not the federal test. It may well be that the court of appeals thought that the harmless error test for the state claim and the harmless error test for the federal claim were, in fact, the same, but they aren't. Let me give you a heads up on my answer to the Carpenter question, which may also be Carpenter, and Carpenter spends a lot of time describing and discussing U.S. Supreme Court cases. But then, it applies to the state standard. It does not apply to the federal standard. That is correct. That was my second point. Thank you for making it for me, Your Honor. So a citation to Carpenter suggests to me, well, we apply the standard the court applied in Carpenter. Exactly. And if you look also at the two other main state cases that the court of appeals applied, which is People v. Danks and People v. Nestler, they do something similar. They discuss the state and the federal components, or state and federal claims, but in the end decide it on the state standard and, in fact, don't hold the prosecution to its burden, which would be required by Chapman to prove beyond a reasonable doubt that the verdict was not affected by the extrinsic information. Okay. Now we've got that set up. Please do go back to the matter. Thank you. Well, I was going to say, the key question before this Court today is, in fact, Brecht, because if we satisfy Brecht, then we necessarily satisfy the D-1 component of AEDPA. So I'd like to focus on how we win this claim under Brecht. Because the government has not met its burden to show that Mr. Coleman's case was not substantially and injuriously affected by being exposed to this very prejudicial criminal history, we win this claim. The key problem with the lower court's denials of Mr. Coleman's juror misconduct claim is that they cherry-picked evidence in the record and stripped the erroneous action from the whole when they were supposed to, in fact, consider the erroneous action in the complete criminal record was harmless. Well, what the magistrate judge did was to say there were, I think, four eyewitnesses who placed him as the driver of the van. And in the face of that, how can we have this evidence that shows up on the back of the photograph for purposes of the present argument inadvertently that shows that he's had a prior arrest? How can that possibly make any difference? How do you respond to that? It makes a difference in several ways. One is that when analyzing these claims, this court has emphasized the fact that the nature of the evidence presented is a key component in determining how prejudicial it is. It does matter what evidence was presented against the defendant, but that's not the primary consideration. What's primary is to look at the nature of the evidence in the context of this case. So, for example, what the jury learned from the information that was not supposed to be included is that one month before the crime, he'd been arrested with a loaded weapon. That turned Mr. Coleman into a very different person from the person that was presented at trial. At trial, Mr. Coleman was someone who was involved with tagging crews, but there was no evidence that he'd acted in a violent way. There was no evidence that he was a felon. There was no evidence that he, in fact, had a gun. How reliable or unreliable was the eyewitness identification? Our argument is that they were not particularly reliable. Three of the jurors were impeached for lying in their testimony during the preliminary hearing to their testimony at trial. They described the driver as wearing different clothing. They described him as having a piercing in a left eye versus his right eye. They were all arguably biased against Mr. Coleman, and in fact, one of the things that the state court focused on was that they had, excuse me, that Mr. Coleman was likely to commit this crime because of an attack that had happened on his brother. But if you look closely at the record, all of the instances of violence and overt antagonism actually happened from the victim and his tagging crew, who were the eyewitnesses against Mr. Coleman, versus, you know, instead of vice versa. The violence was against Mr. Coleman, not Mr. Coleman against them. So when the jury all of a sudden learns that he's got a gun, Mr. Coleman has a gun, that turns him into a very different person. And an arrest for a gun. Okay, you wanted to save some time. Oh, excuse me, Your Honor. Yes, I did. Thank you. Thank you very much. Good morning, Your Honors. David Medea for Respondent. You can start out with the input question. Absolutely, Your Honor. Let me just briefly address why ADEPA applies to this claim. Under Johnson v. Williams, of course, there was a presumption that the state court did address a federal claim in this case. The state court did not explicitly mention the federal claim, and so that presumption here exists. It isn't rebutted because there's nothing in the record in what the state court said to actually support that rebuttal. In fact, the state court did cite the California Supreme Court case, as Your Honor mentioned, Carpenter, which does cite federal cases for the standard. Let me read you from Carpenter after the Carpenter case finishes discussing all these United States Supreme Court cases. And I'm now on, well, I'm on the Pacific Second Reporter, page 995. I'm just reading from the Carpenter opinion. We then stated the test to apply in determining whether jury misconduct requires your judgment to be set aside, quote, a judgment addressed to the defendant in a criminal case must be reversed or vacated whenever the court finds a substantial likelihood, da-da-da-da-da. The court continues, the ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test and objective standard. That's the state test. That's not the federal test. Yes, absolutely. So a citation to Carpenter, if I'm a state court judge and I cite to Carpenter, what I'm citing to is this is the test to be applied. What is the state test? That doesn't tell me that they're applying the federal test. It tells me quite the opposite. Well, I don't think it tells you either one, to be honest. Well, why doesn't it tell me that they're, why does it not tell me they're applying the state test because that's the test that's recited? They're citing the case. So what are they citing it for if they're not reciting it for the state case, state standard that's given us in the case? Well, it's citing the state, the state, citing Carpenter's state case for the state standard. There's no question about that. But within Carpenter itself, the court does analyze federal cases. There's no reason for the court to. But it seems either to mistake them or not to understand that there's also a possibility of Chapman. Well, I. The discussion of the state, of the federal cases is extensive, but it's sort of like a law student writing a sort of a brief in preparation for class. They're just describing the cases. Absolutely. I mean, I think, I think Carpenter doesn't rest their decision on the federal standards. There's no question about that. But the only reason why Carpenter would cite federal cases is if it acknowledges what the federal standard is, that it is there. But in Carpenter, it wasn't necessary to address a federal claim in that way. And so I think that just because the state court in this case did cite Carpenter, it doesn't necessarily mean that it was not deciding the federal standard. It's ambiguous in this case at best. And if it's ambiguous, the presumption hasn't been rebutted under Johnson v. Williams. So where are you relying on the citation to Carpenter as your sort of for your argument that the federal standard was applied? Where in the Court of Appeal opinion are you pointing me? Well, the Court of Appeal only cites it three times, I believe. And there's like two long paragraphs that actually cites Carpenter. And that citation, in Carpenter itself, that citation does refer to the state standard. So we're not arguing that it doesn't. Do you have anything else that tells us that they might have been applying a federal standard? Well, no, because the court didn't address it specifically. And my overall point is that if it doesn't address it specifically, there was a presumption, and they can't rebut that presumption here just because the state court cited another state court that actually used the state standard. That doesn't mean that the court didn't address the federal standard. It just means the state court did address the state standard. Well, no, it clearly means it didn't address it. The question is whether it had in the back of its head and didn't address it. Well, it decided. I mean, that's correct. And I have trouble when we're getting an explicit citation to the state standard, an explicit reliance on the state standard. There's a different federal standard that is more demanding. It's argued to them. They don't respond to it. And they say harmless, addressing only the state standard. I got problems with applying the ordinary presumption when the state court has behaved in that way. I understand, Your Honor. And if I could move on to the juror misconduct claim. And regardless of whether a DUP applies in this claim, the results should be the same. When considered in the context of overwhelming evidence against Petitioner, any juror misconduct here did not have a substantial injurious effect or influence on the verdict. There is no evidence whatsoever that any jurors actually considered the extrinsic evidence during deliberations. There's no evidence of that here. Only three jurors actually remembered seeing this evidence and actually remembered any discussions that that extrinsic evidence was actually in the jury room. You can't say there's no evidence. We have a note from a juror who says that's exactly what happened. You may say that there's not enough evidence, but you can't say there's no evidence. Well, juror number five wrote a letter to the court. But that's unsworn testimony. It's not under oath. So that letter itself can't be. And did that witness not testify in the hearing? She did. She did testify later on, a couple days later. The judge invited her in. And she didn't state what she said in the letter actually in testimony. She didn't testify. There's one statement in the letter that's particularly problematic that she didn't repeat when she testified. In fact, she actually said at testimony that she believes all the jurors understood they weren't supposed to look at this information. I understand they weren't supposed to. It doesn't mean they didn't do it. But there's no evidence they did. And I understand that there's no evidence whatsoever of actual misconduct here. There was error in this case. We've always conceded there was error. And the question is what effect did that error have on the jury? And there's no evidence the juror considered this information improperly. This was a very conscientious jury in this case. They all said that they understood the court's instructions. The court instructed them with Calgic 1.00 and 1.03 and said that they were only supposed to consider the evidence at trial. And that's exactly what the jurors did here. And no juror said otherwise. They only looked at the evidence at trial. Even though three of them did see this information, they didn't consider it. And, in fact, the trial court wasn't allowed to actually ask them if they considered it because of California Evidence Code 1150, which says you can't actually ask the jurors what the subjective deliberations are. Yeah, so we're having trouble then deciding whether or not they considered it because they never answered it. The question was never asked and answered. Correct. And, of course, there's all kinds of problems if you were to ask jurors those kind of questions, which is why under the federal rules and the California Evidence Code, we can't ask those questions. You know, there's an old joke about I dare you not to think of a camel. Did you just think of a camel? I tried not to, Your Honor. But, again, even if there was some kind of juror error in this case, there's no question. The jurors saw this information. Three of them did anyway. But even if they saw this information, again, the evidence here was overwhelming of a petitioner's guilt. There were actually four eyewitnesses. What time of night was this? 9 p.m. So it was dark. Yes, it was dark. And he was the driver. He was the driver. That's correct. Whoever was the driver, Mr. Coleman or not, whoever was the driver was the driver. Never got out of the van? He never did, no, from the shooting. And was the driver's side door ever opened? The driver's side, I don't believe there was evidence the driver's side door was open, but the other door, the passenger's side door, was open repeatedly. And every time the passenger opened the door, the light lit up in the van. And actually three of the witnesses actually said specifically they actually saw the interior of the van because the light came on. And what door was open? It's a van, so is it the front door, passenger's side, or is it sort of the back sliding door? At this point it was unclear exactly which door, but the shooter entered from the right side of the car, so either the front passenger's side or the back rear door. They're not sure exactly which. Maybe the other side knows because that makes a difference in terms of how well you can see. I mean, because if it's the back door, back passenger's side door, you're looking kind of forward and you're seeing at a slightly different angle. Well, all these witnesses saw the driver from all different vantage points. I mean, two of the witnesses actually saw the driver immediately after the shooting. From the left-hand side, the front passenger's side, they were directly across the street. One of the witnesses saw. . . There's some argument that these witnesses who made the eyewitness identification in court had not been entirely consistent over time with their identification. How do you respond to that? Well, there was one that lied to the police the next day because he was a member of a rival tagging crew. And, of course, the testimony from rival tagging crews and gang members isn't exactly always consistent. But he did identify to the police that Petitioner was a driver. He actually came to court and was very consistent in his testimony at court. And all of the identifications were corroborated with each other. There was no. . . Again, there were three eyewitnesses that actually saw Petitioner as a driver who knew him well. One of them testified that he had seen Petitioner 50 times or more before. And there was a fourth witness who had no connection whatsoever to the victim or the Petitioner who also corroborated what these three witnesses said. So the evidence was overwhelming. And there was also the motive here. There's plenty of evidence in the record that actually shows that Petitioner was actually looking for the victim during that day because the victim had attacked Petitioner's younger brother earlier that day. And so he was looking for Petitioner to exact vengeance. And he found him. And he had a friend in his car with a gun. And he ended up shooting him. So again, in light of the overwhelming evidence of Petitioner's guilt and the relatively minor juror error in this case, there's no way Petitioner can show that there was any reasonable possibility that the material actually affected the verdict. Okay. Thank you very much. Thank you. Just a few quick points in rebuttal, Your Honors. First, Juror No. 5's letter was, in fact, entered as a court exhibit. It was Court Exhibit A. So the testimony can or statements can be relied upon as testimony. I would like to focus on the jurors' own statements and the length of their deliberations and the problems they had coming to a verdict to counter the state's argument that the evidence against Mr. Coleman was so overwhelming. First, the jurors did admit that they considered and focused on this evidence. They referred to it. Two different jurors referred to it as part of the evidence package or part of the total evidence that they had to consider with everything else presented in the case. They deliberated for two and a half days. They requested total readbacks of the seven jurors who testified that they had awareness of what happened the night of the crime. In a case that was supposedly so straightforward with four eyewitnesses identifying Mr. Coleman, it's unusual that in a six-day trial the jury took two and a half days to deliberate as to guilt. Was there any other serious issue in the trial except what the identity of the driver was? Serious issue in terms of identifying Mr. Coleman as the driver of the van? Yeah. I'm trying to figure out, okay, how many issues were there in the trial? Were there other issues besides the identity of the driver? No. I mean, there was no other evidence identifying or putting Mr. Coleman at the scene. There was no physical evidence against Mr. Coleman. The eyewitnesses' testimony was the key evidence the state had to say that Mr. Coleman committed this crime. And so if they decided Mr. Coleman was driving the van, they decide one thing. If they decide he wasn't driving the van, they decide another. Correct. And that was the issue to be decided? Yes, Your Honor, that was the issue to be decided. And they spent two and a half days trying to figure that out? Yes, Your Honor, that is correct. I see I'm out of time. Thank you. Okay. Thank you very much. Thank both sides for their helpful arguments.
judges: Graber, W. Fletcher, Owens